Quad Graphics, Inc. v. N.C. Dep't of Revenue, 2021 NCBC 37.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| WAKE COUNTY | 20 CVS 7449 |

QUAD GRAPHICS, INC.,

      Petitioner,

v.

NORTH CAROLINA DEPARTMENT OF REVENUE,

      Respondent.

**ORDER AND OPINION ON FIRST AMENDED PETITION FOR JUDICIAL REVIEW**

THIS MATTER is before the Court on Quad Graphics, Inc.'s ("Petitioner") First Amended Petition for Judicial Review. ("Amended Petition for Judicial Review," ECF No. 9.) Pursuant to § 105-241.16 of the North Carolina General Statutes ("N.C.G.S."), Petitioner seeks review of the June 24, 2020 Final Decision of the North Carolina Office of Administrative Hearings ("OAH") ("Final Decision," Rec., at pp. 938–47).[1] On February 2, 2021, the Court held a hearing on the Amended Petition for Judicial Review.

THE COURT, having considered the Petition, the briefs and supplemental briefs filed in support of and in opposition to the Petition, the official record of proceedings in the OAH, the arguments of counsel at the hearing, the applicable law, and other appropriate matters of record, concludes that the Petition should be GRANTED and the Final Decision should be REVERSED.

---

[1] The Official Record on Judicial Review is filed in 10 parts on the electronic docket at ECF Nos. 27–36, each part consisting of 100 pages. For example, Official Record Part 1 (ECF No. 27) contains pages 1–100 of the Official Record on Judicial Review; Official Record Part 2 (ECF No. 28) contains pages 101–200; and so on. Hereinafter, ECF Nos. 27–36 are referred to as the "Rec.".

*Graebe Hanna & Sullivan, PLLC by Douglas W. Hanna and Akerman, LLP by Michael Bowen for Petitioner Quad Graphics, Inc.*

*The North Carolina Department of Justice by Terence Friedman and Matthew Sommer for Respondent North Carolina Department of Revenue.*

McGuire, Judge.

## I.      FACTS AND PROCEDURAL BACKGROUND

1.      The facts giving rise to this lawsuit are not in dispute.  Petitioner is an S-Corporation headquartered in Sussex, Wisconsin.  Petitioner is engaged in the business of the commercial printing of books, magazines, catalogs, and items for direct mail ("printed materials") to customers throughout the United States.  (Rec., at pp. 192–93, 200.)  Petitioner sold printed materials to customers in North Carolina and to customers who had printed materials delivered to third-party recipients with North Carolina addresses ("direct mail") during the period September 1, 2009 through December 31, 2011 (the "Sales at Issue").  (*Id.* at pp. 245, 551–56.)  Petitioner's customers provided Petitioner with the addresses for the direct mail recipients in North Carolina via mailing lists.  (*Id.* at pp. 200–01, 244.)

2.      It is undisputed that Petitioner received the orders for the Sales at Issue from a customer, produced the printed materials at facilities located outside of North Carolina, and then delivered the printed materials to the United States Postal Service ("USPS") or another common carrier at sites outside of North Carolina.[2]  (*Id.* at p. 224.)  The USPS or common carrier would, in turn, deliver the printed materials

---

[2] Petitioner did not have a printing facility in North Carolina until 2013 when it purchased the assets of a company called Vertis.  (Rec., at p. 224.)

to either the customers or the third-party direct mail recipients inside North Carolina. (*Id.* at pp. 200–01, 244.) The contracts between Petitioner and its customers stated that title to the printed materials, and risk of loss, passed from Petitioner to the customers when the printed materials were deposited on the carrier's shipping dock.[3] (*Id.* at pp. 326, 335, 684–85.)

3.     In August 2009 Petitioner hired a North Carolina resident, Edward Waters ("Waters"), as a sales representative. Waters "solicited orders for printed materials from North Carolina customers[.]" (*Id.* at pp. 245, 260, 555.) Waters did not have authority to accept or approve orders, as all orders were approved and accepted at Petitioner's headquarters in Wisconsin. (*Id.* at p. 244.) Prior to hiring Waters, Petitioner had no employees nor any other physical presence in North Carolina. (*Id.* at pp. 202, 224, 239.)

4.     In or around 2011, Respondent North Carolina Department of Revenue (the "Department") notified Petitioner of its intent to conduct an audit related to Petitioner's business activities within North Carolina. (*Id.* at p. 480.) On November 12, 2015, the Department issued a Notice of Sales and Use Tax Assessment to Petitioner for uncollected and unremitted sales tax arising from sales of printed materials to North Carolina customers for the period January 1, 2007 to December 31, 2011 (the "Initial Assessment"). (*Id.* at p. 635.) Petitioner appealed the Initial Assessment by filing a request for Departmental Review. (*Id.* at p. 43.)

---

[3] This type of contractual shipping arrangement is commonly referred to as Free On Board or Freight On Board Shipping Point ("FOB Shipping").

5.　During the Departmental Review, the Department received additional information from Petitioner and concluded that certain sales should be excluded from the Initial Assessment. (*Id*.) Specifically, the Department removed those sales shipped to North Carolina customers for which Petitioner provided sufficient documentation demonstrating that the transactions were sales for resale by those customers. (*Id*.) The Department also removed those sales that occurred before Petitioner hired Waters in August 2009.[4] (*Id*.) The Department adjusted the Proposed Assessment to reflect these changes, and on November 30, 2018 issued a Notice of Final Determination. ("NOFD," Rec., at pp. 686–93; upholding the assessment of sales tax on the Sales at Issue.)

6.　Petitioner appealed the NOFD by filing a Petition for Contested Tax Case with the OAH. (*Id*. at pp. 5–12.) Petitioner and the Department both moved for summary judgment, and on June 24, 2020, the OAH issued its Final Decision granting summary judgment in favor of the Department, denying Petitioner's motion for summary judgment, and upholding the assessment of sales tax on the Sales at Issue. (*Id*. at pp. 938–947.) The OAH concluded that the Petitioner was a "retailer" as defined under N.C.G.S. § 105-164.3(35)(a) (2010)[5] (*Id*. at p. 942), and that the

---

[4] The Department determined that, prior to Petitioner's hiring of its resident sales representative in North Carolina, Petitioner did not have a sufficient sales tax nexus with North Carolina. (Rec., at p. 641.)

[5] For purposes of this Order and Opinion, the Court refers to the provisions of the North Carolina Sales and Use Tax Act (the "Act") in effect during the period September 1, 2009 through December 31, 2011. The Court's use of the present tense in discussing these statutes is not intended to mean that the discussion applies to the current version of the statute to the extent the statute has been amended effective after December 31, 2011.

Sales at Issue were properly sourced to North Carolina under N.C.G.S. §§ 105-164.4B(a)(2) and (d)(2)(b) (2010). (*Id*. at pp. 944–45.) In addition, while acknowledging that she was "barred" from ruling on Petitioner's constitutional challenges to the NOFD, the administrative law judge ("ALJ") nevertheless opined that the physical presence of Petitioner's sales representative in North Carolina created a sufficient constitutional nexus with the State to support the State's imposition of sales tax on the Sales at Issue.[6] (*Id*. at pp. 942–44.)

7. On July 24, 2020, Petitioner timely filed its Petition for Judicial Review of the Final Decision pursuant to N.C.G.S. §§ 105-241.16 and 7A-45(b)–(f). (ECF No. 3.) On the same day, the case was designated as a mandatory complex business case, and assigned to the Honorable Louis A. Bledsoe, III, Chief Business Court Judge. (ECF Nos. 1–2.) On August 20, 2020, Petitioner filed the Amended Petition for Judicial Review. (ECF No. 9.)

8. On September 24, 2020, the parties filed the stipulated official record of the proceedings in the Office of Administrative Hearings. (Stipulation Regarding Contents of Record, ECF No. 26; Official Record, ECF Nos. 27–36.)

9. On October 2, 2020, the Court issued an Order and Opinion on various motions filed by Petitioner and the Department which, among other things, denied the Department's motion to dismiss the Amended Petition for Judicial Review. (Ord.

---

[6] It is well established that in North Carolina, constitutional questions must be resolved by the courts and not by the State's administrative agencies. *In re Redmond*, 369 N.C. 490, 493 (2017).

and Op. on Respd.'s Mot. to Dism. Petition, Respd.'s Mot. to Stay, and Petitioner's Mot. for Ext. Time to Serve Resp. with Pet. For Jud. Rev., ECF No. 41.) [7]

10. On October 26, 2020, Petitioner filed its Brief in Support of Petition for Judicial Review. ("Brief in Support," ECF No. 42.) On November 30, 2020, the Department filed its Response in Opposition to Petitioner's Petition for Judicial Review on the Merits. ("Response Brief," ECF No. 43.) On December 10, 2020, Petitioner filed its Reply Brief. ("Reply Brief," ECF No. 45.)

11. On January 6, 2021, this matter was reassigned to the undersigned. (Reassignment Ord., ECF No. 46.) The parties came before the Court for a hearing on the Amended Petition for Judicial Review on February 2, 2021.

12. On May 27, 2021, the Court issued a Notice to Provide Supplemental Briefing. (ECF No. 49.) On June 11, 2021, Petitioner and the Department filed supplemental briefs. (Respondent's Suppl. Br., ECF No. 50; Petitioner's Suppl. Br., ECF No. 51.)

13. The matter is now ripe for review.

## II. LEGAL STANDARD

14. Petitioner appeals the Final Decision granting summary judgment in favor of the Department. "A party aggrieved by the final decision in a contested case commenced at the Office of Administrative Hearings may seek judicial review of the decision in accordance with Article 4 of Chapter 150B of the General Statutes."

---

[7] The Court also granted Petitioner's Motion for Extension of Time to Serve Respondent with Petition for Judicial Review (ECF No. 20) and denied the Department's Motion to Stay (ECF No. 13). (ECF No. 41, at ¶ 22.)

N.C.G.S. § 105-241.16. Under Chapter 150B, the task before this Court is to "determine whether the petitioner is entitled to the relief sought in the petition based on [a] review of the final decision and the official record." N.C.G.S. § 150B-51(c).

15. "In reviewing a final decision allowing . . . summary judgment, the court may enter any order allowed by . . . Rule 56" of the North Carolina Rules of Civil Procedure. N.C.G.S. § 150B-51(d). "Appeals arising from summary judgment orders are decided using a *de novo* standard of review." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 257 (2016) (citation omitted). "Under the *de novo* standard of review, the [Court] 'consider[s] the matter anew[ ] and freely substitut[es] its own judgment for' [that of the lower court]." *Id.* at 257 (alterations in original) (citation omitted).

16. Under North Carolina law, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). A genuine issue is "one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472 (1985). Summary judgment is appropriate if "the facts are not disputed and only a question of law remains." *Wal-Mart Stores East v. Hinton,* 197 N.C. App. 30, 37 (2009) (citation omitted).

17.    Further, with respect to the standards applicable to this Court's consideration of constitutional challenges, our appellate courts have held that "[a] law is presumed constitutional until the contrary is shown and the burden is on the party claiming that the law is unconstitutional to show why it is unconstitutional as applied to him." *Perry v. Perry*, 80 N.C. App. 169, 176 (1986).

III.    ANALYSIS

18.    In this appeal, Petitioner raises two arguments.    First, Petitioner contends that the OAH erroneously held that Petitioner was a "Retailer" under the provisions of N.C.G.S. § 105-164.3(35)(a) (2010) that was required to pay *sales* taxes to North Carolina on the Sales at Issue under the Act.    (*Id.* at pp. 6–12.)  Petitioner argues that "this set of facts forms the basis for *use* tax liability for the customers of Petitioner" but "not a retail *sales* tax assessment."[8]    (*Id.*, at p. 2 (emphasis in original).)

19.    Second, Petitioner argues that the Department's assessment of sales taxes on the Sales at Issue is unconstitutional under the Due Process Clause and the Commerce Clause of the United States Constitution.  (*Id.* at pp. 12–22.)   Both of Petitioner's arguments are grounded in its position that although the printed materials were sold to customers for use or consumption in North Carolina, it is undisputed that title and possession of the printed materials took place outside the

---

[8] The North Carolina Sales and Use Tax Act "imposes a use tax on items purchased outside the state and thus not subject to [sales] tax, which are brought into the state for 'storage use and consumption' here." *In re Assessment of Additional North Carolina & Orange County Use Taxes*, 312 N.C. 211, 215 (1984), *appeal dismissed*, 472 U.S. 1001, 105 S. Ct. 2693, 86 L. Ed. 2d (1985); *see also* N.C.G.S. § 105-164.6 (2010).  The Department is not seeking to assess a use tax on the Sales at Issue.

State. Petitioner contends that since title and possession passed outside of North Carolina, the "sales" occurred outside of North Carolina.

20. The Court will first analyze Petitioner's claim that the OAH misapplied the provisions of the Act in deciding that Petitioner is a "retailer" subject to North Carolina's sales tax, and second, the Court will analyze whether the imposition of sales tax on the Sales at Issue comports with the requirements of the United States Constitution.

**A.   OAH's conclusion that Petitioner was a "Retailer" under N.C.G.S. § 105-164.3(35) (2010)**

21. Determination of Petitioner's statutory argument will require the Court to interpret the relevant and overlapping provisions of the Act regarding the sales and use taxes that were in effect during the relevant time period. The Supreme Court of North Carolina summarized the basic principles used by our courts when interpreting the language in a statute as follows:

> [q]uestions of statutory interpretation are ultimately questions of law for the courts . . . . The principal goal of statutory construction is to accomplish the legislative intent. The best indicia of that intent are the language of the statute, the spirit of the act and what the act seeks to accomplish. The process of construing a statutory provision must begin with an examination of the relevant statutory language. It is well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning. In other words, if the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning.

*Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018) (cleaned up); *see also N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009) ("When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.").

22. "Usually, words of a statute will be given their natural, approved, and recognized meaning." *Wilkie*, 370 N.C. at 550. "Courts should give effect to the words actually used in a statute and should neither delete words used nor insert words not used in the relevant statutory language during the statutory construction process." *Midrex Techs.*, 369 N.C. at 258 (cleaned up). The court should "give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr.*, 363 N.C. at 201.

23. Finally, special rules of construction apply where the statute at issue is one concerning taxation. Accordingly, "[t]ax statutes are to be strictly construed against the State and in favor of the taxpayer." *Wal-Mart Stores East, Inc.*, 197 N.C. App. at 42 (internal citations omitted). "If a taxing statute is susceptible to two constructions, any uncertainty in the statute or legislative intent should be resolved in favor of the taxpayer." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001).

24. There are several statutory provisions relevant to the determination of Petitioner's first argument. The Act imposes a privilege tax on the net taxable sales

or gross receipts of "tangible personal property" by a "retailer." N.C.G.S. § 105-164.4 (2010).[9] Under the Act, a "retailer" is defined, in pertinent part, as follows:

> A person engaged in the business of any of the following:
>
> a. Making sales at retail, offering to make sales at retail, or soliciting sales at retail of tangible personal property, digital property, or services for storage, use or consumption in this State.

N.C.G.S. § 105-164.3(35)(a) (2010).

25. The Act further defines various terms within the definition of "retailer." A "person" is defined as "[a]n individual, . . . a limited liability company, a corporation, . . . or another group acting as a unit." *Id.* at § 105-164.3(26) (referring to N.C.G.S. § 105-228.90 (2010)). A "sale" is defined as "[t]he transfer for consideration of title or possession of tangible personal property or digital property or the performance for consideration of a service." *Id.* at § 105-164.3(36) (2010). A "sale at retail" or "retail sale" is "[t]he sale, lease, or rental for any purpose other than for resale, sublease, or subrent." *Id.* at § 105-164.3(34) (2010). "Tangible personal property" is defined as "personal property that may be seen, weighed, measured, felt, or touched or is in any other manner perceptible to the senses" *Id.* at § 105-164.3(46) (2010), which includes "direct mail," defined as "printed material delivered or distributed by the [USPS] or other delivery service to a mass audience or to addresses on a mailing list by the purchaser or at the direction of the purchaser when the cost of the items is not billed

---

[9] The Act also clarifies that a "Complimentary use tax" at the same rate that applies to the *sale* of a product under § 105-164.4 is imposed where property is purchased *outside* the State for "storage, use, or consumption in this State." N.C.G.S. § 105-164.6 (2010). "A product is subject to [a complimentary use tax] only if it is subject to tax under [§] 105-164.4." *Id.*

directly to the recipients." *Id*. at § 105-164.3(7c) (2010). A retailer is "engaged in business" in North Carolina if it "permanently or temporarily" maintains "any representative, agent, sales representative, or solicitor operating in this State in the selling or delivering" of tangible personal property. *Id*. at § 105-164.3(9)(a) (2010).

26. Here, it is undisputed that Petitioner is a "person" (Rec., at pp. 192, 248); that the Sales at Issue involve "tangible personal property" or "direct mail" (*Id*. at p. 553); that the Sales at Issue were "sales" as defined in N.C.G.S. § 105-164.3(36) (*Id*. at p. 276); that Petitioner "engaged in business" in North Carolina by having a resident sales representative in North Carolina selling its products; and that the printed materials were stored, used, and consumed in this State (ECF No. 42, at p. 11).

27. Nevertheless, Petitioner argues that the OAH improperly held that Petitioner was a "retailer" under § 105-164.3(35)(a) (2010) because Petitioner did not make the Sales at Issue in North Carolina. Petitioner first argues that the Act defines a "sale" as "the transfer for consideration of title or possession of tangible personal property." (ECF No. 42, at p. 8.) Petitioner contends that it is undisputed that under the terms of its agreements with its customers, title and possession of the printed materials occurred when Petitioner delivered the printed materials to the USPS or other common carrier outside of North Carolina for delivery to customers and third-party recipients in North Carolina.[10] (*Id*. at p. 10.)

---

[10] The undisputed facts show that Petitioner delivered its printed materials to USPS or other common carrier "F.O.B." at the point of shipment. North Carolina has held that such terms mean that title to the shipped goods transfers at the place of shipment. *Duke Power Co. v. Clayton*, 274 N.C. 505, 516–517 (1968); *Petrus Machinery, Inc. v. Radiator Specialty Co.*, 257

28.     Petitioner next argues that in order to be a "retailer" under § 105-164.3(35) a person must make sales "in this State," and because the transfer of title and possession to the printed materials took place outside of North Carolina, Petitioner cannot be a "retailer" under § 105-164.3(35). (ECF No. 42, at p. 9; ECF No. 45, at p. 3.)  In other words, under Petitioner's interpretation, in order to be classified as a "retailer" under § 105-164.3(35), it must be making sales in which transfer of title or possession of the tangible personal property occurs in North Carolina.

29.     In response, the Department contends that "it is without question that Petitioner is a 'retailer'" under § 105-164.3(35).  (ECF No. 43, at p. 13.)  Specifically, the Department argues that Petitioner attempts to impermissibly "expand[ ] the definition of 'sale' to require that transfer of title and possession occur in the state before [North Carolina] can impose sales tax on the transaction," which is "inconsistent with the General Assembly's intent that [North Carolina] be a destination-based sales tax state[.]" (*Id.* at p. 15.)  In support of this argument, the Department cites to § 105-164.4B, which "expressly provides the principles for determining 'where to source *the sale* of a product.'" (*Id.* (emphasis in original) (citing to N.C.G.S. § 105-164.4B(a) (2010)).)  The Department also cites to § 106-164.8, which imposes, *inter alia*, obligations on a retailer to collect sales and use tax in certain circumstances where sales are contracted or accepted outside North Carolina with

N.C. 85, 86 (1962) ("Where the contract of sale provides for a sale f.o.b. the point of shipment, the title is generally held to pass, in the absence of a contrary intention between the parties, at the time of the delivery of the goods for shipment at the point designated.").

the intent that they be brought into North Carolina for storage, use, or consumption in this State. (*Id*. at p. 16 (citing N.C.G.S. § 105-164.8(a)(2), (4), (6) (2010).)

30.     The Court has closely considered the arguments raised by both parties and concludes that Petitioner's contention that the term "in this State", as used in § 105-164.3(35), requires that transfer of title or possession must take place within North Carolina in order for a person to be considered a "retailer" is untenable. First, and most significantly, the Act imposes both a *sales* and a *use* tax on retailers. In other words, a retailer, as defined by N.C.G.S § 105-164.3(35), includes persons making sales of tangible personal property that is used, consumed, or stored in North Carolina whether or not the sale occurs inside North Carolina.

31.     In addition, a plain reading of the sentence at issue makes clear that the term "for storage, use, or consumption *in this State*" applies to the language in the phrase in which it is situated and does not limit the terms "[m]aking sales at retail, offering to make sales at retail, or soliciting sales at retail" in the first phrase in the sentence. *See* N.C.G.S. § 105-164.3(35) (emphasis added). "Ordinary rules of grammar apply when ascertaining the meaning of a statute[.]" *Winkler v. N.C. State Bd. of Plumbing*, 261 N.C. App. 106, 111 (2018). The "last antecedent rule" is one such example. *See HCA Crossroads Residential Ctrs. v. N.C. Dep't of Human Resources, etc.*, 327 N.C. 573, 578 (1990); *Wilkie*, 370 N.C. at 546–49; *Novant Health, Inc. v. Aetna U.S. Healthcare of the Carolinas, Inc.*, 2001 NCBC LEXIS 1, at *12 (N.C. Super. Ct. Mar. 8, 2001); *R.R. Friction Prods. Corp. v. N.C. Dep't of Revenue*, 2019

NCBC LEXIS 13, at *28 (N.C. Super. Ct. Feb. 21, 2019), *aff'd per curiam*, 374 N.C. 208 (2020).

32.    Under the last antecedent rule, "relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote." *HCA Crossroads Residential Ctrs.*, 327 N.C. at 578. Here, applying the term "in this State" to its last antecedent in the sentence, the statute expands the scope of the definition of "retailer" to include persons making sales of tangible personal property outside of North Carolina where that property will be used, consumed, or stored within North Carolina. It does not limit "retailer" only to persons making sales within North Carolina.

33.    In addition, the definition of "retailer" must be read in conjunction with the other provisions of the Act. *See Huntington Props., LLC v. Currituck Cty.*, 153 N.C. App. 218, 224 (2002) ("Portions of the same statute dealing with the same subject matter are to be considered and interpreted as a whole, and in such case it is the accepted principle of statutory construction that every part of the law shall be given effect if this can be done by any fair and reasonable intendment." (cleaned up). Section 105-164.6, titled "Complimentary use tax," expressly provides the authority for North Carolina to collect a use tax from retailers on tangible personal property sold outside of North Carolina for use, consumption, or storage in North Carolina. Section 105-164.6 provides, in pertinent part, as follows:

> (a)    Tax. – An excise tax at the applicable rate set in [N.C.]G.S. [§] 105-164.4 is imposed on the products listed

below. The applicable rate is the rate and maximum tax, if any, that would apply to the sale of a product. A product is subject to tax under this section only if it is subject to tax under [N.C.]G.S. [§] 105-164.4.

(1) Tangible personal property or digital property purchased inside *or outside* this State for storage, use, or consumption in this State.

N.C.G.S. § 105-164.6 (2010) (emphasis added). The logical construction of these two separate sections of the Act leads to the conclusion that the definition of "retailer" does not include the requirement that a retailer's "sales" occur solely "in this State."

34. Section 105-164.8 also lends support to the Court's construction of the definition of "retailer." That section provides, in pertinent part, as follows:

A retailer is required to collect the tax imposed by this Article notwithstanding any of the following:
. . .

(2) That the purchaser's order or the contract of sale is made or closed by acceptance or approval outside this State, or before any tangible personal property or digital property that is part of the order or contract enters this State.
. . .

(4) That the property is mailed to the purchaser in this State or a point outside this State or delivered to a carrier outside this state f.o.b. or otherwise and directed to the purchaser in this State regardless of whether the cost of transportation is paid by the retailer or by the purchaser.
. . .

(6) Any combination in whole or in part of any two or more of the foregoing statements of fact, if it is intended that the property purchased be brought into this State for storage, use, or consumption in this State.

N.C.G.S. §§ 105-164.8(a)(2), (4), (6) (2010).

35.     These provisions directly address a retailer's obligation to collect taxes under the precise circumstances present here, where a seller transfers title or possession of the products to North Carolina purchasers at a location outside of North Carolina on F.O.B. terms.  Again, these requirements are not consistent with Petitioner's construction of N.C.G.S. § 105-164.3(35) (2010).

36.     Therefore, the Court concludes that the OAH correctly found Petitioner to be a "retailer" within the meaning of N.C.G.S. § 105-164.3(35) (2010).

## B.     Constitutional Arguments

37.     Petitioner next argues that North Carolina's assessment of *sales* tax on the Sales at Issue—where it is undisputed that title and possession transferred to North Carolina purchasers and third-party recipients *outside* of the State—is unconstitutional under the Commerce Clause in light of the United States Supreme Court's holding in *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327 (1944) (precluding sales tax liability on Commerce Clause grounds where out-of-state goods were delivered by common carrier into the state and title and possession to the goods transferred to purchaser outside of the taxing state) (further analyzed infra).  (ECF No. 42, at pp. 12–22; ECF No. 45, at pp.  4–12.)[11]  The Department, of course, argues that the Sales at Issue were properly sourced to North Carolina under N.C.G.S. § 105-164.4B (2010), and that "it is readily apparent that N.C.'s sales tax statutes meet the constitutional requirements under . . . the Commerce Clause[.]"  (ECF No. 43, at pp. 20–24.)

_____

[11] Petitioner also brought a Due Process Clause challenge; however, the Court need only address Petitioner's Commerce Clause argument to reach its decision.

38.     Preliminarily, the Court will address whether the Commerce Clause issue poses either a facial or an as-applied challenge to North Carolina's sales and use tax statutes.  The Supreme Court of North Carolina has held:

> [a]n as-applied challenge contests whether the statute can be constitutionally applied to a particular defendant, even if the statute is otherwise generally enforceable.  A facial challenge maintains that no constitutional applications of the statute exist, prohibiting its enforcement in any context.  The constitutional standards used to decide either challenge are the same.

*State v. Packingham*, 368 N.C. 380, 383 (2015).   Although Petitioner does not expressly label its constitutional challenges as either as-applied or facial, it does state that

> *[i]n this case*, the Department assessed sales tax to the Petitioner based on the fact that the property was used – or enjoyed – by Petitioner's customers in North Carolina. The assessment in this case violates the Commerce Clause because it imposes a sales tax on transactions – the passage of title and possession – occurring wholly outside North Carolina.

(ECF No. 9, at p. 2 (emphasis added).)  Accordingly, the Court interprets Petitioner's constitutional argument as an "as-applied" challenge and will assess whether the Department's application of North Carolina's then-applicable sales and use tax statutes to the Sales at Issue was constitutional under the Commerce Clause.

39.     To reach its decision, the Court need only answer one question: is the holding in *Dilworth* the controlling law.  At the request of the Court, the parties submitted supplemental briefing on this issue.  (ECF Nos. 50 and 51.)  Before directly addressing this question, the Court will first provide necessary background.

*i.     The Department's sourcing of the Sales at Issue to North Carolina*

40.     Here, the Department in the NOFD and the OAH in the Final Decision found that the Sales at Issue were properly sourced to North Carolina under N.C.G.S. § 105-164.4B (2010) and, therefore, concluded that the State properly assessed a sales tax on Petitioner for the Sales at Issue. (Rec., at pp. 17, 944–45.) This sourcing statute provides, in relevant part, as follows:

> (a) General Principles – The following principles apply in determining where to source the sale of a product.
>
> . . .
>
> (2) Delivery to a specified address –When a purchaser receives a product at a location specified by the purchaser . . . , the sale is sourced to the location where the purchaser receives the product.

N.C.G.S. § 105-164.4B(a)(2) (2010). The sourcing principles also provide that "direct mail . . . is sourced to the location where the property is delivered" where "the purchaser provides the seller with information to show the jurisdictions to which the direct mail is to be delivered." N.C.G.S. § 105-164.4B(d)(2) (2010).

41.     Under the language in §§ 105-164.4B(a)(2) and (d)(2), the Sales at Issue are sourced to the location where the purchaser "receives" the printed materials, or the address where the printed materials are "delivered." Petitioner contends that the printed materials are "receive[d]" or "delivered" at the location where title and possession transfers, which in the case of the Sales at issue, was a location outside North Carolina. (ECF No. 45, at pp. 3–4.) The Department contends that the printed materials are "received" or "delivered" at their ultimate destination, which in the case

of the Sales at Issue, was North Carolina. (ECF No. 43, at p. 20.) While framed as statutory arguments, the parties' arguments regarding N.C.G.S. § 105-164.4B have constitutional implications. If Petitioner's Commerce Clause argument prevails, the Department's reading of the statute would lead to an unconstitutional application against Petitioner for the imposition of sales tax on the Sales at Issue.

42. While neither "receives" nor "delivered" is defined in the Act, our Supreme Court has stated:

> [t]he cardinal principal of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same.

*In re Dairy Farms*, 289 N.C. 456, 465 (1976) (citation and internal quotation marks omitted) (emphasis added); *see also State v. T.D.R.*, 347 N.C. 489, 498 ("Where one of two reasonable constructions of a statute will raise a serious constitutional question, it is well settled that our courts should adopt the construction that avoids the constitutional question."); *Appeal of Arcadia Dairy Farms, Inc.*, 289 N.C. 456, 465–66 (applying the same principle to an as-applied challenge to the North Carolina constitution). Thus, the Court inevitably must determine whether the Department's interpretation of N.C.G.S. § 105-164.4B (2010) to source the Sales at Issue to North Carolina comports with the Commerce Clause.

### ii. Commerce Clause

43. The Commerce Clause of Article Three of the United States Constitution authorizes Congress to "regulate Commerce with foreign Nations, and among the

several States." U.S. CONST. art. I, § 8, cl. 3. Along with its affirmative application, the Commerce Clause also includes a "negative sweep" which "prohibits certain state actions that interfere with interstate commerce." *Quill Corp v. North Dakota*, 504 U.S. 298, 309 (1992). Under the so-called "dormant" Commerce Clause, in order for a state to impose a tax on an interstate transaction, the tax must (1) be "applied to an activity with a substantial nexus with the taxing state"; (2) be "fairly apportioned"; (3) "not discriminate against interstate commerce"; and (4) be "fairly related to the services provided by the state." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977).

44. There are two considerations in determining whether a "substantial nexus" exists between a state and the tax it wishes to impose: a "personal nexus" (*i.e.*, a nexus between the state and the taxpayer) and a "transactional nexus" (*i.e.*, a nexus between the state and the activity being taxed). Hayes R. Holderness, *Navigating 21st Century Tax Jurisdiction*, 79 MD. L. REV. 1, 7–18 (2019); *see also* R. Rosen & Marc D. Bernstein, *State Taxation of Corporations: The Evolving Danger of Attributional Nexus*, 41 TAX EXECUTIVE 533, 534 (1989) (referring to the concepts as "presence nexus" and "transactional nexus"); Walter Hellerstein, *Jurisdiction to Tax Income and Consumption in the New Economy: A Theoretical and Comparative Perspective*, 38 GA. L. REV. 1, 3 (2003) (referring to the concepts as "enforcement jurisdiction" and "substantive jurisdiction"); *see also MeadWestvaco Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 25 (2008) ("Where, as here, there is no dispute that the taxpayer has done some business in the taxing State, the inquiry shifts from *whether*

the State may tax to *what* it may tax" (emphasis added)); *Allied-Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 768, 778 (1992) ("[A]lthough our modern . . . jurisprudence rejects a rigid, formalistic definition of minimum connection, we have not abandoned the requirement that, in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax."); *American Bus USA Corp. v. Dep't of Rev.*, 151 So. 3d. 67 (Fl. Ct. App. 2014) (finding that the taxpayer had a nexus with Florida, but holding that the taxing statute as applied to the taxpayer violated the nexus mandate of *Complete Auto*; that is, the "activity" must have a nexus with the taxing state).

45. Here, Petitioner concedes that it has a personal nexus with North Carolina. (ECF No. 45, at p. 6.) Nevertheless, Petitioner argues that this is "only half of the constitutional inquiry. The remaining dispositive question . . . is whether North Carolina has a constitutionally sufficient nexus **with the disputed transactions**." (*Id.* (emphasis in original).) Specifically, Petitioner contends "the controlling transactional nexus cases" of *Dilworth* and *General Trading Co. v. State Tax Commission of Iowa*, 322 U.S. 335 (1944) render North Carolina's transactional nexus with the Sales at Issue insufficient to impose a sales tax on the Sales at Issue. (ECF No. 45, at p. 5; ECF No. 42, at pp. 18–22.) In response, the Department denies that there is a transactional nexus requirement under the Commerce Clause (ECF No. 43, at p. 22), and further argues in its supplemental brief that *Dilworth* is no longer good law (ECF No. 50, at p. 2). To assess these arguments, the Court must

analyze and determine the continuing vitality of *Dilworth* and its companion case, *General Trading*.

    iii.    *Dilworth and General Trading*

46.    In *Dilworth*, the United States Supreme Court considered whether Arkansas could assess a *sales* tax on a Tennessee corporation for certain transactions between the company and residents of Arkansas. 322 U.S. at 327–28. The corporation had no physical presence in Arkansas and was not authorized to do business in Arkansas. *Id*. at 328. Orders from Arkansas residents were made "through solicitation in Arkansas by a traveling salesman domiciled in Tennessee, by mail or telephone." *Id*. The orders required acceptance by the corporation's office in Memphis, Tennessee. *Id*. The corporation's products were shipped by delivery to a carrier in Tennessee, and title passed to the purchaser "in Memphis" upon delivery of the products to the carrier. *Id*. The Supreme Court of Arkansas held that imposition of sales tax on these transactions by Arkansas was precluded by the Commerce Clause. *Id*. at 327. The United States Supreme Court affirmed, stating:

> we would have to destroy both business and legal notions to deny that under the circumstances of the sale – the transfer of ownership – was made in Tennessee. For Arkansas to impose a tax on such transaction would be to project its powers beyond its boundaries and to tax an interstate transaction.
> . . .
> A sales tax is a tax on the freedom of purchase . . . . A use tax is a tax on the enjoyment of that which was purchased. In view of the differences in the basis of these two taxes and the differences in the relation of the taxing state to them, a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of goods sold, involves an

assumption of power by a state which the Commerce Clause was meant to end.

*Id*. at 330.

47.     Conversely, in *General Trading*, Iowa imposed a *use* tax on goods purchased from a Minnesota company by Iowa residents.  322 U.S. at 336.  The Iowa statute at issue required "every retailer maintaining a place of business in Iowa to collect the use tax from the purchaser."  *Id*. (cleaned up).  The company had no physical presence in Iowa.  *Id*. at 337.  "The property on which the use tax was laid was sent to Iowa as a result of orders solicited by traveling salesmen sent into Iowa from [the company's] Minnesota headquarters.  The orders were always subject to acceptance in Minnesota whence the goods were shipped into Iowa by common carriers or the post."  *Id*.  The Iowa Supreme Court held that the company "was a 'retailer maintaining a place of business in this state' within the meaning of the Iowa statute , . . . [and] that Iowa had not exceeded its powers in the imposition of this use tax on Iowa purchasers, and that collection could validly be made" from the company.  *Id*.  The United States Supreme Court agreed, and held that Iowa's use tax did not violate the Commerce Clause, concluding that

> [t]he tax is what it professes to be -- a non-discriminatory excise laid on all personal property consumed in Iowa.  The property is enjoyed by an Iowa resident partly because the opportunity is given by Iowa to enjoy property no matter whence acquired.  The exaction is made against the ultimate consumer -- the Iowa resident who is paying taxes to sustain his own state government. To make the distributor the tax collector for the State is a familiar and sanctioned device.

*Id*. at 338.

48. Thus, in *Dilworth* and in *General Trading* the states imposed different taxes (*i.e.*, sales versus use) and the Court reached different results, with the only significant difference being that in *Dilworth*, Arkansas did not have a sufficient transactional nexus with the sales where title to the products transferred outside of Arkansas, while in *General Trading*, Iowa clearly had a sufficient nexus to tax the in-state use of the products by Iowa residents.

49. Relying on these precedents, Petitioner summarizes its argument as follows:

> [t]he facts of this case are substantially indistinguishable from the pertinent facts in *Dilworth* and are in direct contrast to those in *General Trading Co.* and *Excel [Inc. v. Clayton,* 269 N.C. 127 (1967)].[12] In *Dilworth*, as in this case, though orders were solicited in the taxing state, all orders for tangible personal property were accepted and approved outside the taxing state, and legal title and possession of the tangible personal property passed to the purchasers outside the taxing state. In *Dilworth* and in this case, the tax assessed was a sales tax – not a use tax. There is simply no constitutionally significant distinction between *Dilworth* and the facts of this case. *Dilworth* has not been overruled by the Court and remains the law of the land.

(ECF No. 42, at p. 22 (cleaned up).) The Court agrees with Petitioner that, under *Dilworth*, "a state sales tax survives scrutiny under the Commerce Clause only where

---

[12] In *Excel*, the Supreme Court of North Carolina addressed whether certain purported interstate transactions were subject to sales tax. 269 N.C. 127 (1967). Notably, the Court found that because the out-of-state purchasers arranged for pickup of the products "f.o.b. Lincolnton," North Carolina, the products "were delivered to [the purchasers] in North Carolina, the taxing jurisdiction." *Id.* at 134. Accordingly, the Court held that North Carolina's assessment of a sales tax on the transaction did not violate the Commerce Clause. (*Id.*)

the purchase of tangible personal property – *i.e.*, the transfer of ownership from the seller to buyer – takes place in the taxing state." (ECF No. 51, at p. 1) (hereinafter referred to as the "*Dilworth* formalism.") If the *Dilworth* formalism remains good law, then the sales tax imposed on the Sales at Issue in this case is unconstitutional.

### iv. Arguments as to whether <u>Dilworth</u> remains good law

50. First, Petitioner argues that the United States Supreme Court has "consistently upheld" the *Dilworth* formalism. (ECF No. 51, at p. 1.) Specifically, Petitioner cites to *Oklahoma Tax Comm'n v. Jefferson Lines*, 514 U.S. 175, 186–87 (1995) (citing favorably to *Dilworth*, stating "we [have] held that a sales tax could not validly be imposed if the purchaser already had obtained title to the goods as they were shipped from outside the taxing State into the taxing State by common carrier"); *Itel Cont. Int'l Corp. v. Huddleston,* 507 U.S. 60, 69–75 (1993) (explaining that "Tennessee's sales tax is imposed upon the 'transfer of title or possession,'" and that this tax "on a discrete transaction occurring within the state" does not implicate Foreign Commerce Clause concerns[13]); *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9 (1986) (recognizing there is "no threat of multiple international taxation . . . since the tax is imposed only upon the sale of fuel, a discrete transaction which occurs within one national jurisdiction only"); *American Oil Co. v. Neill*, 380 U.S. 451, 457–58 (1965) (citing favorably to *Dilworth*, stating that "this Court has struck down taxes directly imposed on or resulting from out-of-state sales which were held to be

---

[13] The Foreign Commerce Clause requires satisfaction of the same *Complete Auto* factors assessed in dormant Commerce Clause analysis. *See Itel Containers*, 507 U.S. at 72.

insufficiently related to activities within the taxing state, despite the fact that the vendor knew that the goods were destined for use in that State").

51. Second, Petitioner addresses the United States Supreme Court's most recent sales and use tax decision, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018). (ECF No. 51, at p. 3.) Specifically, Petitioner argues that "[t]he core holding in *Dilworth* . . . was not presented to – or discussed by – the *Wayfair* Court." (*Id.* at p. 4.)

52. On the other hand, the Department argues that the United States Supreme Court "implicitly" overruled *Dilworth* in its decision in *Complete Auto*. (ECF No. 50, at p. 2.) Specifically, the Department argues that:

> [i]n place of the semantic distinctions [between a sales tax and use tax expressed in *Dilworth*] the Court offered a four-part test for evaluating the constitutionality of a tax . . . . Thus, *Complete Auto* articulated a succinct standard by which to test the constitutionality of a tax while explicitly eschewing the *Spector*[14] rule and its rationale, which encapsulated the *Dilworth* understanding of the Commerce Clause. Nothing in the *Complete Auto* standard turned on semantic distinctions between *sales* taxes and *use* taxes. Relying on *Dilworth* as binding precedent would introduce an anachronism into modern state tax jurisprudence by reintroducing a formal interpretation of the Commerce Clause long abandoned by the Court.

(ECF No. 50, at p. 7.) Further, the Department argues that *Wayfair* did not expressly address *Dilworth* because "it was already effectively abandoned under *Complete Auto*." (*Id.* at pp. 10–11.)

---

[14] Referring to *Spector Motor Service, Inc. v. O'Connor*, 340 U.S. 602 (1951), where the Court made state taxation of interstate transactions *per se* unconstitutional. *See also*, *Freeman v. Hewitt*, 329 U.S. 249 (1946) (invalidating a state's gross receipt tax on interstate sales of securities under the same rationale).

a. Complete Auto

53. The Court is not persuaded that *Complete Auto* "implicitly" overruled *Dilworth* formalism. First, *Complete Auto* is neither a sales tax case, nor a nexus case. Its importance is that (1) it established an analytical framework for Commerce Clause cases, on which every case since has relied, *see* 430 U.S. at 279; and (2) it rejected the *Spector* rule that a state tax on the "privilege of doing business" is necessarily unconstitutional in the context of interstate commerce. *Id*. at 288–89.

54. Accordingly, the Court acknowledges that, to the extent *Dilworth* posits that taxation on interstate commerce is per se unconstitutional, *Complete Auto* and other cases have clearly overruled that aspect of its holding. However, the Supreme Court's rejection of the *Spector* rule in *Complete Auto* did not explicitly overrule *Dilworth's* holding that to meet the transactional nexus requirement under the Commerce Clause, a state *sales* tax must only be imposed on sales where the transfer of title or possession occurs within the taxing state. This position is consistent with conclusions reached by commentators. *See* Paul J. Hartman, *Federal Limitations on State and Local Taxation* § 11.4 (2d ed.) (Supp. Nov. 2020) (acknowledging that the Court in *Complete Auto* "abandoned the position that any tax found by the Court to be imposed on interstate commerce is a per se violation of the commerce clause" but "[u]nless the Court changes its ideas about what constitutes a sufficient nexus for sales tax purposes of the taxed event to the taxing state, apparently the *Dilworth* holding will remain"); Richard D. Pomp, *Wayfair: It's Implications and Missed Opportunities*, 58 WASH. U. J. L. & POL'Y 1, 53 (2019) ("[T]here is, however, another

aspect of *Dilworth*. The whole transaction, starting with solicitation in Arkansas and ending with the consumer having possession of the goods in Arkansas, constituted interstate commerce, which, under the jurisprudence of the day, could not be taxed. That part of the opinion was clearly overturned by subsequent cases. But still left open is the constitutional definition of where a sale takes place.").

      b. Wayfair

55.    With respect to *Wayfair*, the Court is similarly unpersuaded that its holding has any effect on the *Dilworth* formalism. In *Wayfair*, the United States Supreme Court considered "when an out-of-state seller can be required to collect and remit [a South Dakota sales] tax" and "reconsidere[d] the scope and validity of the physical presence rule mandated by" *National Bellas Hess v. Dep't of Rev.*, 386 U.S. 753 (1967) and *Quill*, 504 U.S. 298, under the Commerce Clause.[15] 138 S. Ct. at 2088.

56.    South Dakota enacted a statute which "require[d] out-of-state sellers to collect and remit sales tax 'as if the seller had a physical presence in the state'" if the seller "on an annual basis, deliver[s] more than $100,000 of goods or services into the State or engage[s] in 200 or more separate transactions for the delivery of goods or services into the State." *Id*. at 2089 (quoting S.B. 106 at ¶¶ 3, 5, 8(10)). S.B. 106

---

[15] The physical presence rule originated in *Bellas Hess*, where the Court held that in order for a tax to pass muster under the Due Process Clause or the Commerce Clause, the taxpayer must have a physical presence in the taxing jurisdiction. 386 U.S. at 758–60 ("[T]he Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail."). Later, in *Quill*, the Court overruled *Bellas Hess* to the extent it "indicated that the Due Process Clause requires a physical presence for the imposition of duty to collect a use tax . . . as superseded by developments in the law of due process." *Id*. at 308. However, with respect to the Commerce Clause, the *Quill* Court held that the physical presence "bright-line rule" remained good law. *Id*. at 312–319.

expressly excluded the retroactive application of this new tax requirement for out-of-state sellers. *Id*.

57. South Dakota filed a declaratory judgment action against on-line retailers Wayfair, Inc., Overstock.com, Inc., and Newegg, Inc., none of which had any employees or real estate in South Dakota, "seeking a declaration that the requirements of [S.B. 106] are valid and applicable to respondents[.]" *Id*. The South Dakota Supreme Court affirmed a lower court's decision that S.B. 106 was unconstitutional due to respondents' lack of physical presence in South Dakota, reasoning that "*Quill* has not been overruled [and] remains the controlling precedent on the issue of Commerce Clause limitations on interstate collection of sales and use taxes." *Id*. (quoting 901 N.W.2d 754, 761 (S.D. 2017)).

58. On review, the United States Supreme Court first acknowledged that

> [u]nder this Court's decisions in *Bellas Hess* and *Quill*, South Dakota may not require a business to collect its sales tax if the business lacks a physical presence in the State. Without that physical presence, South Dakota must rely on its residents to pay the use tax owed on their purchases from out of state sellers.

*Id*. at 2088. However, the Court ultimately vacated and remanded the decision of the South Dakota Supreme Court, overruling the *Bellas Hess* and *Quill* physical presence rule, and upholding the constitutionality of S.B. 106. *Id*. at 2098–2100. In the absence of the bright-line physical presence rule, the Court relied on the first prong of the *Complete Auto* test, which "simply asks whether the tax applies to an activity with a substantial nexus with the taxing state." *Id*. Further, the Court stated, "a substantial nexus is established when the taxpayer [or collector] 'avails itself of the

subsequent privilege of carrying on business' in that jurisdiction." *Id*. at 2099 (citation omitted).

59.    As applied to S.B. 106, the Court in *Wayfair* held that the statute's applicability thresholds require a "quantity of business [that] could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota." *Id*. at 2099.  Accordingly, in the case of Wayfair, Inc., Overstock.com, Inc, and Newegg, Inc.—all entities for which S.B. 106 was applicable—the Court held that the Commerce Clause tax "nexus is clearly sufficient based on both the economic and virtual contacts respondents have with the State." *Id*.

60.    Notably, as pointed out by Petitioner, the *Wayfair* Court did not have reason to consider any questions regarding whether there existed a transactional nexus between South Dakota and the sales being taxed because the parties "agree[d] that South Dakota has the authority to tax these transactions." *Id*. at 2092.[16] Accordingly, the Court concludes that *Wayfair* does not overrule the *Dilworth* formalism.  Again, this Court's conclusion is in line with conclusions reached by commentators.  *See* Adam Themmesch, Darien Shanske, & David Gamage, *Wayfair: Sales Tax Formalism and Income Tax Nexus*, STATE TAX NOTES 975, 976 (Sept. 3, 2018) (stating that the *Wayfair* Court "certainly did not explicitly overrule" the "*Dilworth* formalism" and "uncertainty involving this issue leads us to conclude that the better course for states would be to continue to abide by *Dilworth* formalism and to enact economic nexus standards through their use tax systems"); Richard D. Pomp,

---

[16] The Supreme Court's Opinion does not indicate whether title to the products sold by Wayfair to the South Dakota residents passed inside or outside of South Dakota.

*Wayfair: Its implications and Missed Opportunities*, 58 WASH. U. J.L. & POL'Y 1, 51–56 (2019) (opining that "[p]ost-*Wayfair* legislation should . . . clarif[y] that it is the use tax that remote vendors are being asked to collect and not the sales tax" as to avoid "a potential problem" created by the holdings in *Dilworth* and *General Trading*); Hayes R. Holderness, *Navigating 21st Century Tax Jurisdiction*, 79 MD. L. REV. 1, 13–24 (2019) (surveying the transactional nexus requirement since *Dilworth* and explaining that "the decision and the parties [in *Wayfair*] focused on the personal nexus issue" and "did little with respect to the transactional nexus doctrine").

c.  State Courts and Dilworth

61.  In further support of its arguments, Petitioner cites to a number of state court cases which have adhered to the Court's holding in *Dilworth*. *See Lamtec v. Dep't of Revenue*, 215 P.3d 968, 971 (Wash. Ct. App. 2009) (holding that *Dilworth* applies solely to transaction-based taxes (*i.e.,* sales taxes) and not gross receipts/activity-based taxes such as the Business & Occupation tax imposed on a New Jersey corporation);  *TA Operating Corp. v. Fla. Dep't of Revenue*, 767 So. 2d. 1270, 1275 (Fla. Dist. Ct. App. 2000) (relying on *Dilworth* and holding fuel shipped "F.O.B. Brunswick, Georgia" was not subject to Florida's fuel tax); *World Book, Inc. v. Mich. Dep't of Treasury*, 459 Mich. 403, 412, 590 N.W.2d 293 (1999) (relying on *Dilworth* and holding that where a Michigan taxpayer was "through selling" (*i.e.*, title and possession passed to buyers outside the State), the sales were subject to Michigan use tax, and not sales tax);  *Bloomingdale Bros. v. Chu*, 513 N.E.2d 233, 234 (N.Y. 1987) ("[T]he ultimate destination of the goods is not necessarily the location of a

particular sale [citing *Dilworth*]. Delivery may occur before the merchandise reaches its final destination. Delivery, in the sense that physical custody is transferred, may take place several times during the course of a transaction, but it is only that delivery which transfers control of the merchandise for consideration which marks a taxable event [(citations omitted)]."); *Sears, Roebuck and Co. v. Lindley*, 436 N.E.2d 1029, 1032 (Ohio 1982) (holding that *Dilworth* precluded the imposition of Ohio sales tax on newspaper inserts printed outside Ohio and mailed into Ohio, with title and possession passing outside Ohio).

62.     In support of its contrary argument, the Department cites to state court cases which have treated *Dilworth* as obsolete. *See Arizona Dep't of Revenue v. Care Computer Sys., Inc.*, 4 P.3d 469, 471 (Ariz. Ct. App. 2000) (rejecting the argument that a "transaction privilege tax requires a higher level of nexus with the taxing state than does a use tax" reasoning that "[t]his argument is based on cases that were decided when state taxes on interstate commerce were *per se* unconstitutional," referring to *Dilworth*, *Freeman*, and *Spector*); *Greenscapes Home & Garden Prods. v. Testa*, 129 N.E.3d 1060, 1071 (Ohio Ct. App. 2019) (explaining that "[*Dilworth*] was decided at a time when . . . state taxes on interstate commerce were per se unconstitutional" and that "[i]n *Complete Auto*, the U.S. Supreme Court overruled this line of cases and upheld a privilege on doing business tax on gross receipts from interstate commerce."); *Baker & Taylor, Inc. v. Kawafuchi*, 82 P.3d 804, 815 (Haw. 2004) (holding the same and declining to find *Dilworth* determinative).

63. Petitioner, on the other hand, argues that *Care Computer* and *Greenscapes* "are of limited relevance" to this case due to the fact that (a) they both involve gross-receipts-based taxes—not sales taxes (ECF No. 51, at pp. 9–12; citing to *Lamtec*, 215 P.3d at 971 and *Ford Motor Co. v. City of Seattle*, 156 P.3d 185, 190 (Wash. 2007) (holding *Dilworth* irrelevant where the tax involved is not a sales tax, but rather a business and occupation tax on the privilege of doing business in the taxing jurisdiction); and (b) both *Care Computer* and *Greenscapes* misinterpret *Complete Auto* as a rejection of the holding in *Dilworth*. (ECF No. 51, at p. 12.)

64. Both parties make compelling arguments regarding the impact of *Dilworth*, *Complete Auto*, and *Wayfair* on this case. The Court has thoroughly reviewed the parties' arguments, the relevant court decisions, and other persuasive authorities, and concludes that (a) *Complete Auto* did not overrule the *Dilworth* formalism; (b) *Wayfair* did not overrule the *Dilworth* formalism; and, therefore (c) the *Dilworth* formalism remains the law of the land. Absent contrary authority from the United States Supreme Court, the Court concludes that the principles set forth in *Dilworth* are controlling, and finds that North Carolina does not have a sufficient transactional nexus with the Sales at Issue under the Commerce Clause to impose *sales* tax on the Sales at Issue.

65. Therefore, the OAH's finding that the Sales at Issue were properly sourced to North Carolina under N.C.G.S. § 105-164.4B (2010) giving North Carolina authority to impose sales tax on those transactions is unconstitutional as applied to Petitioner and should be REVERSED. The Sales at Issue lacked a sufficient

transactional nexus to North Carolina under the Commerce Clause of the United States Constitution since it is undisputed that title to the Sales at Issue passed to the purchasers and third-party recipients outside of North Carolina.[17]

IV.    CONCLUSION

THEREFORE, IT IS ORDERED that the Final Decision is REVERSED and summary judgment is hereby entered in favor of Petitioners.


SO ORDERED, this the 23rd day of June, 2021.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases

---

[17] Again, the Court emphasizes that its conclusion on this "as applied" challenge—that the Department's sourcing of the Sales at Issue to North Carolina under N.C.G.S. § 105-164.4B (2010) is unconstitutional—is not intended to apply to any later enacted revised versions of the statute.